United States v. Maggard et al. I'd like to use the first portion of my argument to address the wiretap issue and reserve the next four minutes to present Dorothy Neely's argument as her counsel is not able to be present. That's her counsel was? Kenneth Riggins. Okay, thank you. He had a death in his family. So the district court, it's our position that the district court abused its discretion in not suppressing the calls and the text messages that were intercepted pursuant to the wiretap applications and the orders that were entered in February and March of 2014. It's our position that the affidavits that were submitted in support of the wiretap applications did not support the necessity for a wiretap. And in fact, the information that's contained in the affidavit evidenced the sufficiency of less intrusive investigative techniques. When Congress first enacted Title III, it recognized that wiretapping was an extraordinary investigative tool and that it should not be used routinely. So the procedural requirements for gaining access to wire interceptions were created specifically to prevent police agencies from using them in place of traditional investigative techniques. It's our position that the district court could not reasonably have concluded that normal investigative procedures reasonably appeared to be unlikely to succeed in this case where the government's affidavit sets forth the fact that normal investigative techniques were bearing fruit at the very time they applied for the wiretap. The application says, basically the applications that the government submitted just parrot the statute where they say that there's probable cause to believe that normal investigative procedures have been tried and failed. In fact, they recite a litany of normal investigative procedures, all of which have been successful for them, including obtaining what they consider reliable information from a cooperating defendant in another case, credible information from an informant utilizing a paid informant, utilizing consensually recorded telephone calls and text messages, making controlled purchases of methamphetamine from their targets, analyzing the results of those purchases, and more. records and pen registers and trap and trace devices, and going so far as to obtain information from the use of an informant who contacted and conversed with the lead defendant's relatives. So the normal investigative procedures that we would expect the government to use were tried and were being successful at the very time they represented to the court that they were a failure. They did not identify. They didn't say they were a failure. They didn't say it was sufficient enough. They indicated that the normal investigative procedures have been tried and failed in their affidavit. And then they go on to talk about investigative techniques that they did not employ because they appeared to be unlikely to succeed. And really the only investigative technique that they detailed as being unlikely to succeed was a trash pull, which we really don't see much use of in federal investigations anyway. The third prong of that necessity that some types of investigative techniques would be too dangerous to employ, completely no information at all in support of that argument in either affidavit. And there was nothing in the recitation of the facts in either affidavit that would indicate that the government perceived any danger from the investigation here. So they concluded early on that they could not recruit informants, and that was one, I think, an example of an investigative technique that they thought might be unlikely to succeed. At the same time, they were saying that they planned to interview informants after they got the wiretap. So they're looking ahead, predicting their ability to be able to do so, which indeed they were able to do so, after they got the wiretap. They relied on a statement that the continued use of specified informants that they had was unlikely to achieve all of the investigative objectives, which we think is not a reasonable expectation on their part this early in the investigative process. So it's the defendant's belief, the defendant appellant's belief, that the use of the traditional investigative techniques as set forth in the wiretap affidavits in support of their application was perfunctory. It was just a prelude to requesting wiretap authorization. It flies in the face of Congress's intent in acting Title III. And we acknowledge that the burden that this Court has imposed on these type of arguments is not high. But it shouldn't be eradicated. The burden shouldn't be eradicated lest the interception of private conversations becomes commonplace and lest it becomes a part of a routine investigation here. We think that the low bar required in Anderson and its progeny is not met, where the factual predicate does not establish that the government requires the wiretap interception, even while it's benefiting from normal investigative techniques. We would ask that the Court reverse the convictions of those appellants whose words and text messages were intercepted and used against them at trial. But we generally let the district judge make that determination, don't we? I understand that it's... You're right when they did say they failed, but the district judge said that they should go ahead and use it if they wanted to. I understand that the district judge is the first court to review it, but it's our position that the application did not support the decision of the district court judge. If I might turn to Dorothy Neely's argument, Ms. Neely asserts that there was insufficient evidence to allow a reasonable jury to find beyond a reasonable doubt that she supplied the methamphetamine that killed Jesse Jackson, and therefore the district court erred in imposing the sentencing enhancements on counts 1 and 6. Ms. Neely was sentenced to an aggregate term of 264 months. That represents a significant enhancement on counts 1 and 6 for the distribution of methamphetamine resulting in death. It actually raises the mandatory minimum on each of those counts from 10 to 20 years. We acknowledge that this court has held that the challenge of overcoming a jury verdict based on insufficiency is a daunting challenge, but I think that even viewing the light, even viewing the evidence in a light most favorable to the government in this case, we're entitled to a reversal of the enhancements if there's no evidence that reasonably supports the verdict, and the watchwords here would be reasonable and supports. Not every statement that's made by a government witness, no matter how incredible, can be relied on to reasonably support a proposition, nor can any statement by a government witness, no matter whether it's an inference as opposed to a factual recitation, support what this court has required to be a rational decision of the fact finders. In this case, there was no direct evidence that Ms. Neely provided the methamphetamine that killed Jesse Jackson. No one testified that they saw Neely at the Jackson home on the day of Jesse Jackson's death. No one testified that Ms. Neely told them that she was there. Didn't some friends testify to seeing Neely's car that day? There were two witnesses who testified that they saw a vehicle there that looked like her car. One said that it was a blue four-door vehicle. The other said it was a nice-looking dark car. No one saw her in or near the car. No one knows whether she would have been driving the car if it was hers that day or if someone else would have been driving it. We had another Neely friend say she was going to see Jeremy that day, right? Yes. There was testimony from another witness, Jennifer Parsons, who said that Dorothy Neely was at her home and left the home, saying that she was either going to go to Donald Maggard's or Jeremy Jackson's. And we don't know whether she did what she told Mrs. Parsons that she was going to do or not. There was testimony that she had, that Neely had purchased methamphetamine from her on several occasions, right? There was testimony that Jeremy Jackson had purchased methamphetamine from Neely on multiple occasions. However, he lived in not only a high-crime area but an area that was infested with meth use and dealership. Several of the government's witnesses testified that within walking distance you could buy meth at other locations close to the Jackson home. We know that he had methamphetamine the night before this happened from the testimony of government witness Kylie Day. There was only one person who testified on behalf of the government who said that Mr. Jackson made a statement that would seem to indicate that Dorothy Neely was present in the home on the day that he and his wife ingested the methamphetamine. And her testimony was directly contradicted by the testimony of Christine Rogers, who testified that she was present at the same time and that Jeremy said nothing about the source of the methamphetamine. Given the contradictory information and facts provided by the government's witnesses and the fact that there is no good evidence that Neely was actually at the Jackson home on the day in question, we believe that this is a case where the burden has not been carried, was not carried by the government, and there is insufficient evidence from which a reasonable juror could find beyond a reasonable doubt that the methamphetamine that was ingested by Jesse Jackson was provided by Ms. Neely. Thank you, Ms. Cook. Thank you. Mr. Westerfield. Good morning. May it please the Court. I represent David Bell, who represented himself at trial. I was standby counsel, in other words, there in case he needed me. I'm going to speak to the claimed error regarding the denial of the severance motion, the request for Mr. Maggard and Mr. Bell to have a separate trial from Mr. Jackson and Ms. Neely. In looking at the briefs, I don't think there's any dispute as to the standards that are applied in this. I think it's more of a look at the application of those standards to this case. I would note this case was extraordinary in that there was only two defendants who were actually the focus of the sentence enhancement causing death. Those two defendants were joined in this indictment by the government. I would note that I don't think there can be any dispute that Mr. Bell and Mr. Maggard were not in the chain of distribution of the alleged methamphetamine that may have caused Mrs. Jackson's death. We would also note that there were no dealings between Mr. Jackson and Mr. Maggard or Mr. Bell. In other words, they weren't dealing with each other at all as far as the evidence shows. And there really was no substantial evidence that Mr. Maggard or Mr. Bell even knew about the dealings, the alleged dealings between Ms. Neely and Mr. Jackson. And I think those are important facts when looking at whether or not, number one, there was prejudice here, but more importantly whether or not that evidence would have been admissible, the evidence of Ms. Jackson's death and all of the circumstances surrounding that, would have been admissible against Mr. Bell and Mr. Maggard in a separate trial. We've submitted they would not. The government claims that this death was, quote, an overt act as part of a conspiracy. That is not true. This was a sentence enhancement. This is not a RICO case where, in a RICO case, I think it was the Soto Beniquez case, the murder that the defendants who were seeking separation were complaining about was actually part of the RICO indictment. It was one of the ways in which this corrupt organization was working. Mrs. Jackson's death was not furthering the conspiracy. It was not part of the conspiracy. It was not a death that took place to hide the conspiracy. It was simply alleged as a sentence enhancement alone. Mr. Westerfield, do we have a waiver issue here? Yes. The government claims that because Mr. Bell did not renew the motion at the close of the evidence that it should be found waived. It's our position that, number one, any renewal of the motion at that point in time would have been futile. Prior to trial, and the motion was dealt with a month before trial, and there were other motions that dealt with this, the admissibility of this evidence of Mrs. Jackson's death. The district court had made it clear that a separate trial was not going to be granted and that that evidence was coming in. But isn't the requirement of having to do it at the close of the evidence to give the district court one final ability to assess when all evidence is in? I appreciate your argument about the course of the trial. That is true, but also in looking at Rollins, which is actually a joinder of offenses where there are multiple robberies, the court talked about not letting a defendant go through the whole trial hoping for an acquittal and then raising this on direct appeal, which to me indicates that there's some, you know, to prevent trickery or subterfuge by defense counsel. This was not the situation here. Mr. Bell was representing himself. He chose to do that. He had a constitutional right to do that. That was not what was going on here. And I think the district court made it clear throughout the pretrial proceedings that this evidence was going to come in and that it was going to be a joint trial. So we would submit that that waiver should be overlooked in regard to Mr. Bell. And finally, we submit that there is substantial prejudice from this joint trial that Mr. Bell and Mr. Maggard had with Ms. Jackson and Ms. Neely, because if you look at the evidence that was presented, the death of Mrs. Jackson became a central theme at the beginning of the trial. I think it's seven of the ten witnesses testified about this. No mention of Mr. Bell, no mention of Mr. Maggard. And then at the end, it began, it was a focus again. And what the government did here, Your Honor, if you look at the opening and closing, what they did was tell this jury that these people in this conspiracy were destroying lives, and they equated Mr. Jackson and Ms. Neely with Mr. Bell and Mr. Maggard, saying, look at this, they destroyed their lives, they actually killed Mrs. Jackson, and that you should find them guilty to a certain extent based on that. So we would ask the court to reverse Mr. Bell's conviction and Mr. Maggard's conviction for the denial of this motion for separate trials. Thank you. Thank you, Mr. Westerfield. Mr. Schall. Good morning, Your Honors. Good morning, counsel. May it please the court. My name is Ajay Schall, and I represent the defendant, Jeremy Jackson. The prejudicial evidence involving Jesse Jackson's death should have been excluded. Mr. Jackson was charged with conspiracy and distribution of meth causing death. The prejudicial facts submitted by the government are not probative of any element of those charges or the death enhancement. These facts include the defendant playing video games while his wife was overdosing, the defendant and his wife had sex during her convulsing, the defendant picked up his wife and dropped her four feet to the ground because he thought she was faking the seizures, sending text messages with photos of her while she was convulsing. These are awful facts, but they are not probative of the elements of the charges. The death element only requires the death enhancement only requires that the meth cause death. This was not a homicide. There is no requirement or intent or malice aforethought.  These facts were only introduced to paint the defendant in the darkest light possible. This was a ten-day jury trial. The government opened its case with three days of testimony primarily on these points. Then these facts were reprised at the end and brought up in the closing statement. The district court even conceded that there were 403 issues here. Although there were multiple objections and a standing objection, the court did not sustain those objections. This evidence should have been excluded by the district court. The government argued in its response that this issue was not preserved at trial. There were multiple objections made. Even if it was not preserved at trial, and we are not conceding that, this could be overturned as plain error. The error was clear and obvious. The prejudicial facts at issue are not probative of the elements of the crime. It affected substantial rights. It is possible this error changed the result of the trial. Those prejudicial and damaging facts were only brought in to paint the defendant in the darkest light possible. We respectfully request that Mr. Jackson's convictions be reversed and remanded to the district court for a new trial. Thank you, Mr. Shaw. Thank you. Mr. Wood. Counsel, Your Honor, may it please the court, Bob Wood on behalf of the government. I think I'd like to start, if it's okay with the court, with the preservation of the severance and evidentiary claims. Both claims depend, in this court's review, in the government's position, is that they depend on how they were presented to the district court, and they were presented as the fact of the death. The district court did not know, when ruling on severance and exclusion of the evidence, even on the first day of trial, didn't know that the nature of the objection transcended the death and went to things like the video games, sex, all of that. And that's why Judge Barker said, look, you guys, I've ruled. I have ruled clearly on the fact of the death itself, how that works out from a 403 perspective, from a severance perspective, but my understanding is there's going to be some pretty prejudicial evidence in this case. When that comes up, you need to help me do a 403 balance. And there's a lot of case law on the notion that the 403 balance is done on the spot. And when the government suggested a continuing objection at the beginning of the trial, that continuing objection went to the motion in limine, which was specific to the fact of death. So on both claims, what the district court was presented with was the notion of, how does Jesse's death itself affect the different players here, not this other evidence? And that gives me a segue to what role that other evidence played separate from the preservation issues. And just to take a few mentioned here, again, beyond the death itself, which is at least essentially relevant to a couple of people, the death resulted from a distribution, which was an overt act. The death was an enhancement. The distribution was an overt act of the conspiracy. And as several courts have said, a death resulting from a distribution like that is a foreseeable act of conspiracy. All of these people were not only buying meth, but were selling it to others. And they're aware that people overdose, especially in this neighborhood, where apparently, according to the testimony of trial, overdoses are unfortunately common. Then you have some of the more difficult evidence for people to hear, like that Jeremy was having sex with his wife. Of course, he told Desiree Booker that when he spun-duckied this meth from Dorothy Neely, sex was much better. So this was relevant to the notion that he was on drugs that he had received that day. And of course, the central element of the government's proof in this case is that what all of these people are distributing in this small town in Indiana is in fact methamphetamine. And that's a key element of proof. And this went to that, as did his choice not to call 911. He said, no cops. That's pretty good evidence. You could say that that's just evidence of callousness and focus on its prejudice. But it's also evidence that he was worried about being discovered, as Jesse's condition at that point was the result of drug trafficking that he had engaged in, specifically with Dorothy Neely. Then there's other evidence, like the video game evidence and dropping her and yelling at her. The government's position is that, first, that's relevant to show that he was high. It wasn't meant specifically, as they say, in some sort of broad extension of Old Chief to paint him as an evil character. It was to show that drugs were involved intimately that day. And a lot of this evidence also shows how and why the events transpired that day. There were these four women who were in and out of the house throughout the day. And, for example, when Jeremy and Jesse had sex, two of the women left. So that, in part, explains why they were gone. And then they came back later because of some of the text messages he sent. And so, anyway, the government's position is that all of that is relevant to specific aspects of the case the government had to prove. And I can agree that it's not nice evidence at all. But it is relevant to the way things played out in leading to Jesse's unfortunate death. And I'll turn also quickly just on the wiretaps. The wiretap affidavits didn't parrot the statute. They were over 40 pages long. The failure that the government mentioned was specifically the failure to achieve the full goals of the investigation, not a discrete failure that would have been addressed by further pursuit of those specific types of investigation. And then the idea of danger is baked into some of the claims made in the affidavit, such as the claim that an undercover agent would have been a silly idea because this group was so close-knit. They were rejecting their friends who were asking them for drugs, who we tried to use. We had phone calls with their 20-year-long acquaintances who they had sold drugs to before trying to get drugs, and they sniffed us out. And putting undercover agents or informants in that kind of a tenuous situation certainly implies danger. How large is this community? How large? So it's a small community within North Vernon itself, and North Vernon is not more than 10,000 people. Country Square Lakes is a subdivision. I don't know off the top of my head. But I could say if you had a really good arm, you could throw a baseball from Donald Maggard's house to Jeremy Jackson's house, which is in part why when Dorothy told Donald Maggard, and there was evidence that Dorothy told Donald Maggard that she was distributing methamphetamine to Jeremy through Ashley Wright, she also used the shorthand, I'm at Jeremy's house, when talking to him about why she was late for a meetup at Donald Maggard's house. So they knew each other. And Bell knew about Neely, not in the same intimate way. Bell did not live, to be clear, in Country Square Lakes. He lived elsewhere. But he knew about specific deals that Donald Maggard was doing with Dorothy and Neely at hotels. In fact, on one deal that Maggard did in Indianapolis, Maggard was worried about surveillance, and he called Bell and said, I need help getting home in a car other than my own. And Bell arranged for two people who weren't as intimately involved in the conspiracy to go up in separate cars and pick him up and drive him back. So they were all intimately involved, and at least in pretty, in somewhere between general and specific sense aware of each other. And let me see if there's any. Oh, and I would just push back on this notion that the government's arguments in closing equated the defendants. That, I think, is a real stretch in reading. I don't want to be the arbiter of what we said, but in talking about the lives that they impacted, most of that discussion was on the degradation of Country Square Lakes, not the death of Jesse Jackson. And they all contributed to the degradation of Country Square Lakes and to North Vernon. But the references to Jesse Jackson, if you look at the way the prosecutor laid out his argument, there were specific silos of evidence. This part is relevant to Bell and Maggard. This part is relevant to Jesse Jackson. And then, of course, the court's instructions address that as well. And I think that covers most of my responses, unless the court has additional questions. I'll rest on my feet. Thank you. Thank you, Mr. Wood. Ms. Cook. First of all, the death of Jesse Jackson was not charged as a foreseeable act of the conspiracy. It was only charged as an enhancement with respect to two of the many defendants. And the district court recognized a continuing objection to the facts of Jesse Jackson's death on the record at the beginning of the trial. And continuing objections are customary in the Southern District of Indiana. The government participated in that discussion and had no objection to the recognition of that continuing objection. You say continuing objection is permitted, right? Yes, Your Honor. And contrary to the government's assertion, the testimony about the act of Jeremy Jackson having sex with his wife was not presented by any one of those witnesses to prove that either one of those two participants had been using meth. It was never introduced. None of the witnesses were ever asked whether based on Jeremy Jackson's actions that day, no matter how bad those actions were, indicated to them that he had been using meth. Those were completely separate. Not a single witness was asked by the government if those actions that the government presented tended to show that either one of the Jacksons had been using meth. And finally, I just want to say that the affidavit in support of the wiretap applications never provides any factual basis for an assertion that the law enforcement officers believed they were in danger. We see that in applications regularly, and we would normally be looking for language about the defendants having guns or having participated in acts of violence and that sort of thing completely absent in the affidavit in support of the applications here. All right. Thank you. Thank you, Ms. Cook. Mr. West, your bill. I'll be brief, Your Honors. My statement about the government equating these four people as destroying lives is in the almost second paragraph of the government's closing, where the United States Attorney talks about this community, this country, Squire Lakes. Quote, it's an open market in which people like Donald Maggard and Jeremy Jackson can sell methamphetamine from their trailers at will. The sales of methamphetamine by Donald Maggard and Jeremy Jackson helped destroy the community and destroy people's lives. But despite the destruction of the community, despite the destruction of people's lives, to these four defendants, these four defendants, methamphetamine dealing is a business. That's equating. He equated it also in his initial, he equated the four defendants in his opening also. One last thing I'd like to comment upon is the smallness of this community. And yes, it is a small community. I grew up in a rural community. You end up knowing many neighbors, many more than in a big city like Chicago. Of course, I've never lived in a big city like Chicago, so I don't know. But these people did know their names. But that does not indicate that they were aware of the dealings that Ms. McNeely was having with Jeremy Jackson. In other words, the questions were, did you know this person? Yes, a lot. But were they actually, was Mr. Maggard and Mr. Bell in the chain of distribution that led to Ms. Jackson's death? We would submit the evidence is clear they were not. They were not charged with the enhancement, but yet they were tried in a case where the death, the horrible death of this woman, became the theme of the government. Thank you. All right. Thank you, Mr. Westerfield. Mr. Shaw. Your Honors, the district court did receive an objection on the 403 and did in fact rule on it. And on the first day of trial, at the end of the day, at the end of the trial, at the end of that day, the district court said, and I quote, the objection that was interposed pre-trial was a 403 objection that the prejudicial effect of the evidence outweighs its probative value. I ruled on that. That's a quote, volume one, page 93. The 911 call was not an issue here. We're not talking about the 911 call.  They have no probative value as to the elements of the charge. Whether he had sex with his wife while she was having seizures, whether he's playing video games, these facts are not probative of whether he distributed meth and whether that meth caused her death. And with that, thank you, Your Honors, for the opportunity to be heard. All right. Thank you, Mr. Shaw. Thanks to all counsel. The case is taken under advisement.